# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | * |
| MYSHAE V. HUNTER ET AL., | |
| | * |
| Plaintiffs, | |
| | * |
| v. | |
| | *          Civil No. 25-1544-BAH |
| ABBOTT LABORATORIES, INC., | |
| | * |
| Defendant. | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

This product liability case arises from the tragic loss of an infant child to medical complications resulting from *Salmonella*.[1]  Plaintiff Myshae Hunter ("Hunter") and Jordan Matthews (collectively "Plaintiffs"), the parents of deceased child J.M., brought suit against Abbott Laboratories, Inc. ("Defendant" or "Abbott") alleging wrongful death (Count I), negligent misrepresentation or omission (Count II), breach of express warranty (Count III), breach of implied warranty (Count IV), strict product liability under a failure to warn theory (Count V), strict liability for a manufacturing defect (Count VI), a claim for damages (Count VII), and a claim for punitive damages (Count VIII).  ECF 1.  J.M.'s parents filed suit and allege that J.M. passed away due to complications from a *Salmonella* infection in 2023.  *See id.* at 1 n.1.  Plaintiffs allege that their son's death resulted from the consumption of one of Defendant's infant formula products.  *Id.* at 3.  Pending before the Court is Abbott's motion to dismiss.  ECF 11.  Plaintiffs filed an opposition, ECF 18, and Abbott filed a reply, ECF 19.  All filings include memoranda of law, and Abbott's

---

[1] References to bacteria such as *Salmonella* have been italicized throughout this opinion, including in quoted material that did not originally include italicization.

motion includes one exhibit.[2]  The Court has reviewed all relevant filings and finds that no hearing

is necessary.[3]  *See* Loc. R. 105.6 (D. Md. 2025).  Accordingly, for the reasons stated below,

Abbott's motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

### A.    Factual Background

The Court accepts as true all well-pleaded facts in Plaintiffs' complaint and draws all

reasonable factual inferences in their favor.  *See Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d

527, 539 (4th Cir. 2013).[4]

#### 1.    Abbott Laboratories, Inc.

Abbott is a Delaware corporation with its principal place of business in Illinois.  ECF 1, at

4–5 ¶ 10.  "Abbott Laboratories manufactures, labels, markets, distributes, and sells infant

formulas under the Similac, Alimentum, and EleCare brands—all of which have been subject to

recall for bacterial contamination."  *Id.* at 1 ¶ 1, at 7 ¶ 20.  Specifically, the "Abbott Nutrition

Division" of the company engages "in the business of manufacturing and selling medical products,

including powdered infant formulas."  *Id.* at 5 ¶ 12.  According to the complaint, Abbott is "the

number one seller of pediatric nutrition products" and "one of the most dominant players in the

baby formula market."  *Id.* at 6–7 ¶¶ 18–19.  "Abbott's products are marketed, distributed, and

sold in a uniform manner throughout the United States, and are available for purchase at thousands

---

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[3] Abbott's request for a hearing, ECF 20, is denied.

[4] The complaint references several statements from the Food and Drug Administration ("FDA") and the Center for Disease Control ("CDC").  *See* ECF 1.  Defendants agree that those statements are properly before the Court under the doctrines of judicial notice and incorporation by reference. ECF 11-1, at 15.

of retail locations and online[.]" *Id.* at 7 ¶ 21. Similac is the particular brand of infant formula at issue in this case. *See id.* at 6 ¶ 16.

2. *Salmonella* and *Cronobacter* Bacteria

Plaintiffs allege that "[p]owdered infant food manufacturers have long been well-aware of the risks of *salmonella* contamination in manufacturing plant environments, particularly spray driers within their manufacturing plant." ECF 1, at 17 ¶ 54. "*Salmonella* are a group of bacteria that can cause gastrointestinal illness and fever called salmonellosis." *Id.* at 20 ¶ 64. "Most people with salmonellosis develop diarrhea, fever and abdominal cramps," but "[m]ore severe cases of salmonellosis may include a high fever, aches, headaches, lethargy, a rash, blood in the urine or stool, and in some cases, may become fatal." *Id.* Like *Salmonella*, Plaintiffs allege that *Cronobacter* bacteria contamination is also a concern in infant food manufacturing. *See id.* "*Cronobacter* bacteria can cause severe, life-threatening infections (sepsis) or meningitis (an inflammation of the membranes that protect the brain and spine)." *Id.* at 18 ¶ 56. "*Cronobacter* bacteria can get into formula powder if contaminated raw materials are used to make the formula or if the formula powder touches a contaminated surface in the manufacturing environment." *Id.* at 19 ¶ 57.

3. FDA Investigations and Recalls Leading Up to October 2022

"From the 2010 recall of 5 million cans of Abbott formula to the disastrous sequence of events leading up to the February 2022 recall," Plaintiffs contend that "Abbott's Sturgis, Michigan factory exhibited a worsening trend of contamination and quality controls brought on by a refusal to make the investments necessary to prevent contamination of its powdered infant formula that it marketed for use by an extremely vulnerable infant population who often relied on these products as the sole source of sustenance." ECF 1, at 8 ¶ 26.

"On October 22, 2010, the FDA issued a Form 483[.]" *Id.* at 9 ¶ 28. "The Form 483 followed Abbott's announcement of its decision to recall approximately 5 million cans of Similac-brand powdered infant formula produced in its Sturgis, Michigan factory due to the possibility of beetles or larvae contaminating its powdered infant formula after it detected the presence of 'insect parts' during formula production." *Id.* ¶ 29. The Form 483 included the following observations about Abbott's Sturgis, Michigan factory:

    i.    Failure to manufacture foods under conditions and controls necessary to minimize contamination;

    ii.    Effective measures are not being taken to exclude pests from the processing areas; and

    iii.    There is no assurance that raw materials which are susceptible to contamination with extraneous materials comply with current FDA standards and defect actions levels.

*Id.* at 8–9 ¶¶ 25, 28. Following the issuance of the form, "[t]he FDA issued an Establishment Inspection Report in March 2010 that referenced at least two consumer complaints of *Salmonella* following ingestion of Abbott's powdered infant formula." *Id.* at 9 ¶ 29.

Plaintiffs allege that "[s]ubsequent inspections established a pattern of Defendant's disregard of reasonable, responsible industry practices with respect to the manufacturing, processing, packing, and holding of its powdered infant formulas." *Id.* at 10 ¶ 31. For example, "a September 2018 FDA Establishment Inspection Report referenced two observations during an earlier 2017 inspection related to the 'lack of protection from ambient contamination of over/under filled containers in the Line filling room' and 'review of the preventative controls plan and batch records showed that not all the preventative control points were shown as documented in the batch record.'" *Id.* ¶ 32 (citation omitted). "The same report referenced 'two confirmed *Cronobacter* [ ] results.'" *Id.*

4

Plaintiffs allege the FDA activity at the Sturgis facility continued in 2019. "On September 16, 2019, FDA officials returned to Defendant's Sturgis Facility for an inspection which resulted in [the] FDA finding that Defendants failed to 'test a representative sample of a production aggregate at the final product stage, and before distribution, to ensure that the production aggregate meets the required microbiological quality standards.'" *Id.* at 10–11 ¶ 34 (citation omitted). And according to another FDA Form 483, "issued on September 24, 2019, Defendant failed to 'test a representative sample of a production aggregate of powdered infant formula at the final product stage and before distribution to ensure that the production aggregate meets the required microbiological quality standards.'" *Id.* at 9–10 ¶ 30 (citation omitted). "The FDA's 2019 Establishment Inspection Report ("EIR") noted two additional observations by FDA investigators:"

i.   On September 16, 2019, [investigators] observed a window screen located on floor the floor of a dryer building "with accumulated dust-like debris collected on the exterior of the screen," and

ii.  On September 18, 2019, [the] [investigators] observed that the firm [Defendant's Sturgis facility] "does not obtain water samples for radiological testing from a point in the system in which water is in the same condition as when used in infant formula manufacturing."

*Id.* at 11 ¶ 35 (second alteration added) (citation omitted). "Other observations detailed in this 2019 Report include numerous cracks, stains and repairs involving multiple dryers used in Defendant's powdered infant formula manufacturing process at this facility." *Id.* ¶ 46.

A review of Defendant's environmental sampling records also revealed that Abbott "had positive EB," or "*enterobacteriaceae* bacteria," "samples in several non-product contact areas and one product contact area." *Id.* at 11–12 ¶ 36 (citation omitted). "In addition to sampling positive for EB, there were 'a series of 6 positive results [of *Listeria*] in the 8oz. filler area over the dates

of 4/30/2019 – 6/15/2019.'" *Id.* at 12 ¶ 36 (citation omitted). "The FDA's 2019 Report noted that Defendant Abbott planned to destroy the affected batch on October 15, 2019." *Id.* ¶ 37.

During the pandemic, FDA officials apparently ceased most food safety inspections. *See id.* ¶ 39. Consequently, FDA officials "did not show up to the Sturgis plant in 2020." *Id.* Plaintiffs allege, however, that "Abbott's own records indicate that, in June of 2020, it destroyed products because of *Cronobacter Sakazakii* contamination." *Id.* at 12–13 ¶ 39 (citation omitted). "When FDA inspectors did return in September 2021," they again "cited Defendant's Sturgis plant for various problems, including standing water and equipment issues." *Id.* at 13 ¶ 40. Another FDA Form 483, "issued September 24, 2021," observed that:

    i.    Defendant failed to maintain a building used in the manufacture, processing, packing, or holding of infant formula in a clean and sanitary condition; and

    ii.    Defendant's personnel working directly with infant formula, its raw materials, packaging, or equipment or utensil contact surfaces did not wash hands thoroughly in a hand washing facility at a suitable temperature after the hands may have become soiled or contaminated.

*Id.* ¶ 41. Around the same time, "the FDA issued an Establishment Inspection Report in September 2021 based on its inspections of Abbott's Sturgis, Michigan factory." *Id.* at 14 ¶ 42. The report observed "that Abbott received at least 17 complaints over its powdered infant formula products between September 1, 2019 and September 20, 2021, of which at least 15 related to infants having contracted *Salmonella* and another for *Cronobacter*." *Id.* The report also described "finding *Cronobacter* in at least two batches of Abbott's finished powdered infant product on September 25, 2019 as well as in five different environmental samples." *Id.*

In September of 2021, the Minnesota Department of Health "investigated a case of an infant who was sickened by *Cronobacter sakazakii*." *Id.* Investigating officials apparently "knew that the infant had consumed powdered formula produced at an Abbott Nutrition facility in Sturgis,

Michigan, and shared this information with the FDA and CDC in September." *Id.* ¶ 43. "The FDA received reports of the first illness on September 21, 2021, and the agency notified Abbott Laboratories the following day on September 22, 202[1]." *Id.* ¶ 44. "At least two additional reports of *Cronobacter Sakazakii* occurred between September and December of 2021." *Id.* at 14–15 ¶ 45. "On January 31, 2022, the FDA found 'several positive *Cronobacter* results' from environmental samples during an inspection of the Sturgis facility," and "Abbott's internal documents indicated . . . previously destroyed infant formulas in connection with the contamination issue." *Id.* at 15 ¶ 46. Around that time, the FDA "received one complaint of an infant with *Salmonella* infection who consumed formula from the Sturgis facility" but concluded there was "not enough information available to definitively link the illness with the recalled infant formula." *Id.* ¶ 47. Additionally, "a whistleblower report dated October 19, 2021" noted violations at the Sturgis Facility, including the falsification of records "after the discovery of microorganisms . . . in a batch of infant formula." *Id.* at 22 ¶ 68 (citation omitted). "On February 17, 2022, the FDA, in conjunction with the CDC, announced a warning to consumers to not purchase or use certain of Abbott's powdered infant formulas." *Id.* at 15 ¶ 48. Specifically, the FDA indicated that it was "deeply concerned about [the] reports of bacterial infections." *Id.* at 16 ¶ 49 (citation omitted).

Plaintiffs allege that "Abbott took no action for nearly five months after it learned about the first reported illness, potential contamination issues at the Sturgis Facility, and the FDA inspection which indicated that there were serious noncompliance issues at the Sturgis Facility." *Id.* ¶ 50. Moreover, Plaintiffs allege that "Abbott was alerted to the whistleblower's complaint about its Sturgis-based factory as far back as February 2021." *Id.* at 23 ¶ 70. Plaintiffs aver that

eventually "Abbott announce[d] that it had found evidence of *Cronobacter sakazakii* in the non-product contact areas of the Sturgis Facility." *Id.* at 16 ¶ 50.

In February of 2022, after two infant deaths suspected to be related to formula contamination, two U.S. Senators "demanded Abbott Nutrition hand over information and documents related to the company's infant formulas." *Id.* at 20–21 ¶ 65. An FDA Form 483 issued on March 18, 2022 observed that:

    i.    Defendant failed to set in place and/or maintain a system of process controls that cover all stages of infant formula processing to ensure the product does not become adulterated due to the presence of microorganisms (such as *Cronobacter*) in the formula or in the processing environment;

    ii.    Defendant further failed to ensure that all surfaces that contacted infant formula were maintained to protect infant formula from being contaminated with microorganisms, (such as *Cronobacter*);

    iii.    Defendant failed to document any determination as to whether a hazard to health exists due to contamination with microorganisms (such as *Cronobacter*);

    iv.    Defendant's personnel that worked directly with infant formula, its raw materials, packaging, equipment, or utensil contact surfaces failed to wear necessary protective apparel.

*Id.* at 21 ¶ 66. The FDA apparently investigated "128 consumer complaints collected by the FDA between December 2021 and March 2022, including 25 described as 'life-threatening illness/injury.'" *Id.* at 22 ¶ 67 (citation omitted). The complaints included "reports of multiple forms of infection," including "*Cronobacter sakazakii*, Proteus mirabilis, COVID-19, *Salmonella*, CDIFF (*Clostridioides difficile*), Shigella, astrovirus, and 'shigelloides.'" *Id.*

On May 16, 2022, the United States Department of Justice ("DOJ") filed a complaint and proposed consent decree applicable to Abbott's Sturgis plant. *Id.* at 23 ¶ 72. "Abbott eventually joined the DOJ's consent decree[.]" *Id.* at 24 ¶ 73. By January of 2023, the DOJ's Consumer Protection Branch "opened a criminal investigation of Abbott over contamination at its Sturgis,

Michigan factory that led to the facility's temporary closure and nationwide product shortage." *Id.* at 27 ¶ 79. "On March 28, 2023, after approximately one year of multiple investigations led by various agencies," Frank Yiannas, the former FDA Deputy Commissioner, testified in the United States House of Representatives regarding the conditions at the Sturgis facility. *Id.* at 28–29 ¶ 81. Yiannas testified that "the FDA received a series of reports of infants with confirmed *Cronobacter Sakazakii* infections, and each of these infants had consumed infant formula products produced from a single manufacturing plant located in Sturgis, Michigan." *Id.* at 29 ¶ 81. He also testified that those illnesses, along with the conditions detected at the Sturgis facility during FDA inspections and the presence of *Cronobacter Sakazakii* led to Abbott's February 17, 2022 recall. *Id.*; *see also id.* at 29–32 ¶ 82 (detailing Yiannas' testimony).

"In addition to all the manufacturing issues and concerns associated with the production and distribution of powdered formulas, in October 2022, there was a recall of the ready-feed NeoSure products." *Id.* ¶ 87. "The recall was due to an improper seal of the products." *Id.* "An improper seal is known to cause spoilage, but also allows for the introduction of contamination into the products." *Id.* at 33–34 ¶ 87. Plaintiffs allege that most recently, "[i]n May 2023, the FDA investigated the Abbott facility in Casa Grande, Arizona." *Id.* at 33 ¶ 86. "Throughout the course of that investigation, there were similar deficiencies to those identified at Sturgis." *Id.*

4.    Baby J.M.

Plaintiffs' child, J.M., was born on September 6, 2023 at Johns Hopkins Hospital. *See id.* at 35 ¶ 91. While in the hospital, J.M. was provided the "Similac Neosure ready-made product as well as well as Similac Neosure powdered infant formula." *Id.* ¶ 92. J.M. was "not breast fed" and "was exclusively fed the ready-made Neosure product at Johns Hopkins" and Hunter "was discharged with approximately 8 ready-made Neosure bottles and one can of Neosure powdered formula." *Id.* ¶¶ 93, 95. After discharge, J.M. "continued to ingest the Similac Neosure powder

formula." *Id.* ¶ 94.  Plaintiffs "only used bottled water to mix the Simila[c] formula." *Id.* ¶ 98.
During this period, Plaintiffs were never informed of any "prior recall or of the contamination risk
associated with the use of powder formula." *Id.* ¶ 97.

"On or around September 26, 2023," J.M., who was less than one month old, began
exhibiting "symptoms including lethargy and difficulty breathing." *Id.* at 35–36 ¶¶ 99–100.
Hunter drove J.M. "to the Hopkins Emergency Department," where "doctors administered CPR to
Plaintiffs' infant child for 25 minutes." *Id.* at 36 ¶¶ 100–01.  J.M. "was intubated and admitted to
the PICU," or Pediatric Intensive Care Unit.  *See id.* ¶ 101.  A later "head ultrasound showed
hypoxic ischemic brain injury without bleeding and an EEG showed no[] brain activity." *Id.* ¶
102.  An abdominal ultrasound also "showed diffuse intestinal edema and focal pneumatosis,
suspicious for ischemic injury," and "bloody stools were noted." *Id.* ¶ 103.  "After nearly 24 hours
of this grueling experience, [Hunter] decided to end ventilatory support for [J.M.] due to the
severity of his injuries and the likelihood of a very poor neurological outcome were he to somehow
recover." *Id.* ¶ 104.  J.M. died on September 27, 2023.  *Id.* ¶ 105.  "Urine cultures revealed
*Salmonella* within [J.M.]'s system," and "[a]n autopsy revealed leptomenigitis which aligns with
the pathogenic mechanisms of a *Salmonella* infection." *Id.* ¶ 107.

### B.    Procedural History

On May 13, 2025, Plaintiffs filed their complaint in this Court, alleging various violations
under state law related to negligence and product liability.  *See* ECF 1, at 37–47.  On July 28, 2025,
Abbott filed the pending motion to dismiss under Rules 12(b)(1) and 12(b)(6).  *See* ECF 11; ECF
11-1, at 12.  Abbott's motion is now ripe for resolution.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a complaint for a lack of subject matter jurisdiction.  "Rule 12(b)(1) governs motions to dismiss for mootness and for lack of standing, which pertain to subject matter jurisdiction."  *Stone v. Trump*, 400 F. Supp. 3d 317, 333 (D. Md. 2019); *see also Pruitt v. Resurgent Cap. Servs., LP*, 610 F. Supp. 3d 775, 779 (D. Md. 2022) (explaining that motions to dismiss for lack of standing are considered under Rule 12(b)(1)).  In deciding whether a complaint alleges facts sufficient to support subject matter jurisdiction, the Court assumes the truthfulness of the facts alleged.  *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).  "Motions to dismiss for lack of subject matter jurisdiction are properly granted where a claim fails to allege facts upon which the court may base jurisdiction."  *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005) (citing *Crosten v. Kamauf*, 932 F. Supp. 676, 679 (D. Md. 1996)).

### B.    Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted."  In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III.    <u>ANALYSIS</u>

Abbott argues that "Plaintiffs in this case fail to meet basic, foundational pleading requirements of the Federal Rules of Civil Procedure and/or the standing requirements of Article III." ECF 11-1, at 8. Abbott advances two arguments as to why the Court should dismiss Plaintiffs' complaint in its entirety. *See id.* First, Abbott argues that "Plaintiffs fail to establish a plausible basis to conclude that J.M.'s *Salmonella* diagnosis was caused by ingestion of Abbott's formula in 2023" and instead provide only allegations of "purported *Salmonella* diagnoses made years earlier about other infants who allegedly consumed Abbott formula." *Id.* Second, Abbott argues that "Plaintiffs offer no basis to conclude J.M.'s *Salmonella*-related diagnosis is 'fairly traceable' to Abbott's formula (as Article III requires)." *Id.* If the Court declines to dismiss Plaintiffs' complaint in its entirety, Abbott contends in the alternative that "the Complaint should be narrowed to eliminate claims that suffer from one or more common deficiencies." *Id.* The Court addresses Abbott's broader arguments for dismissal of the complaint first and then turns to its claim-specific arguments.

### A.    Article III Standing and Causation

Abbott argues that the complaint should be dismissed in its entirety "because Plaintiffs have not alleged injuries that are 'fairly traceable to the challenged conduct of the defendant'" and thus "lack the requisite Article III standing." ECF 11-1, at 13 (quoting *Town of Chester, N.Y. v.*

*Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017)).  Relatedly, Abbott argues that the complaint should be dismissed because "Plaintiffs fail to allege causation that is 'plausible on its face,' which is an element of Plaintiffs' tort and warranty claims."  ECF 11-1, at 13 (quoting *Twombly*, 550 U.S. at 570); *see also, e.g.*, *Phipps v. Gen. Motors Corp.*, 363 A.2d 955, 958 (Md. 1976) (noting that the "essential elements of an action in strict liability" include "(1) the product was in defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) *that the defect was a cause of the injuries*, and (4) that the product was expected to and did reach the consumer without substantial change in its condition" (emphasis added)).  Defendants argue that Plaintiffs rely "on a scattershot series of conclusory and/or irrelevant assertions" related to "historical deficiencies at Abbott's Sturgis, Michigan facility" but "devoid of facts connecting the formula allegedly ingested by J.M. to the Sturgis facility, let alone any other specific Abbott facility."  *Id.* at 14.  Moreover, Defendants argue that "even if Plaintiffs had sufficiently alleged that the formula consumed by J.M. was manufactured at Sturgis, they offer no plausible basis for believing the formula was the cause of J.M.'s *Salmonella* diagnosis here."  *Id.*

"As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021).  That is true even where a cause of action arises under state law, "because the existence of a 'case or controversy' is '*the* threshold question in every federal case.'"  *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 219 (4th Cir. 2020) (emphasis in *Hogan*) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)) (collecting cases).  "To establish Article III standing, the plaintiff seeking compensatory relief must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision.'" *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc.*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Defendants' arguments concern the second element of Article III standing.  "The 'fairly traceable' requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "But traceability 'does not mean that plaintiffs must show to a scientific certainty that defendant's'" actions "caused the precise harm suffered by the plaintiffs.'" *Id.* (internal quotation marks omitted) (quoting *Nat. Res. Defense Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992)).  "If scientific certainty were the standard, then plaintiffs would be required to supply costly, strict proof of causation to meet a threshold jurisdictional requirement—even where, as here, the asserted cause of action does not itself require such proof." *Id.*  "Thus, the 'fairly traceable' standard is 'not equivalent to a requirement of tort causation.'" *Id.* (quoting *Watkins*, 954 F.2d at 980 n.7).  Moreover, "[w]hile defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the 'independent action of some third party not before the court.'" *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560).

Article III causation and tort causation are distinct but related concepts, and many federal courts have recognized that the Article III causation standard is less exacting than the standard for proving tort causation.  *See, e.g.*, *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) ("The standard for establishing traceability for standing purposes is *less demanding* than the

standard for proving tort causation." (emphasis in original)); *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) ("Article III standing demands 'a causal relationship,' but neither the Supreme Court nor our Court has ever held that but-for causation is always needed."). Because the Court ultimately concludes that Plaintiffs have sufficiently pled causation for purposes of their state law claims, the Court's analysis discusses Defendants' challenge to causation under Rules 12(b)(1) and 12(b)(6) concurrently.

Plaintiffs argue that they have "stated a plausible basis for causation—based on the established link between contaminated formula and *Salmonella* infection, J.M.'s exclusive consumption of Abbott formula during his life, and the temporal relationship between J.M.'s diagnosis and said consumption." ECF 18, at 20. Plaintiffs also contend that their allegations are "similar to those in other cases against Abbott in which Abbott has advanced these arguments to no avail." *Id.* at 17 (first citing *Gray v. Abbott Lab'ys, Inc.*, No. 10-CV-6377, 2011 WL 3022274, at *3 (N.D. Ill. July 22, 2011); and then citing *Bland v. Abbott Lab'ys, Inc.*, No. 3:11-CV-430-H, 2012 WL 524473 (W.D. Ky. Feb. 16, 2012)).

In *Gray v. Abbott Laboratories, Inc.*, the Northern District of Illinois rejected Abbott's claim that the plaintiff had failed to plead causation. 2011 WL 3022274, at *3. There, the complaint alleged that the plaintiff "purchased Similac formula in September 2010, her son became ill as a result, and she believes that his gastrointestinal problems were due to consuming contaminated Similac products that were later recalled." *Id.* Although the court "agree[d] with [the defendants] that [the plaintiff] ha[d] not provided a detailed description about the illness [her son] experienced, and it is obviously possible that [the son]'s illness was unconnected to his ingestion of infant formula," that did not "require the conclusion that her complaint amount[ed] to a 'bare assertion' of causation." *Id.* Likewise, in *Bland v. Abbott Laboratories, Inc.*, the Western

District of Kentucky considered whether the plaintiffs sufficiently "pleaded facts establishing Similac caused them any damage because they [did] not allege any direct observation of beetle parts in the product they purchased and [the child]'s alleged symptoms are consistent with his diagnosis of pyloric stenosis, not consumption of beetle parts." 2012 WL 524473, at *2. There, plaintiffs alleged they fed their child "multiple units of Similac subject to Abbott's recall and that [their child] suffered gastrointestinal illness and a feeding aversion in close proximity to consuming Similac." *Id.* Although the Court observed that Abbott's "competing explanation" for the child's medical condition "may cast serious doubt on the presence of beetle parts in the portions of Similac" consumed, it did "not render Plaintiffs' claim implausible at the pleading stage." *Id.*

However, in both cases Plaintiffs invoke, the children allegedly consumed a product that was subject to a recall. Here, October 2022 is the last recall alleged in the complaint related to Similac NeoSure products, which occurred approximately one year before J.M. ever consumed the product. *See* ECF 1, at 33 ¶ 87. Nevertheless, "a complaint need only include 'enough factual matter (taken as true) to suggest" that an element is met, 'even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely.'" *Marsiglia v. C. R. Bard, Inc.*, Civ. No. RDB-24-3170, 2025 WL 3041826, at *3 (D. Md. Oct. 31, 2025) (quoting *Twombly*, 550 U.S. at 556). "This Court has explained that pleading causation requires showing 'some connective thread' between the alleged harm by defendant and the alleged injury to plaintiff." *Id.* (citing *Gough v. Rock Creek Sports Club*, Civ. No. PJM-19-3533, 2021 WL 795447, at *2 (D. Md. Mar. 2, 2021)).

Although it applied Connecticut law, the Court finds Judge Underhill's opinion in *Ferry v. Mead Johnson & Co., LLC*, persuasive here. 514 F. Supp. 3d 418 (D. Conn. 2021). There, the court considered whether a plaintiff adequately alleged that the defendants' infant formula

products were the proximate cause of the death of an infant who died from the effects of an intestinal infection. *Id.* at 444. The defendants argued that the infant "was born extremely prematurely and that such babies are statistically at a high risk for developing" intestinal infections. *Id.* In concluding that the plaintiff had adequately alleged causation for a design defect claim, Judge Underhill reasoned that (1) the plaintiff "need not allege that the [d]efendants' infant formulas were the *only* cause of [the infant] developing [an intestinal infection] and dying," (2) the plaintiff "allege[d] a temporal connection between [the infant]'s health and her ingestion of the [d]efendants' formulas," and (3) the plaintiff alleged that defendants' "cow milk-based infant formulas significantly increased the risk of—and, in fact, caused—[the infant] to develop" the infection. *Id.*; *cf. Vavak v. Abbott Lab'ys, Inc.*, No. SACV101995JVSRZX, 2011 WL 13130493, at *2 (C.D. Cal. Mar. 7, 2011) (concluding that plaintiff had "not adequately alleged causation" and "did not have standing to bring [the] action" where her only allegations included purchasing the Similac formula for her infant "[i]n or about 2010" and alleging that after ingestion, her child "was sickened as a result," but provided no further specifics nor alleged that the child had exclusively consumed Similac formula).

As in *Ferry*, Plaintiffs here have alleged a close temporal connection between J.M.'s birth, on September 6, 2023, his allegedly exclusive consumption of Abbott's product following his birth, and his death on September 26, 2023. *See* ECF 1, at 35 ¶¶ 91–99. Plaintiffs further allege that a defect in Abbott's manufacturing of the NeoSure products, among other sources, facilitated the growth of the *Salmonella* that allegedly contaminated the NeoSure formula and which may have led to J.M.'s death. ECF 1, at 36 ¶¶ 107–08, at 44–43 ¶ 153. Plaintiffs also allege the existence of studies suggesting that powdered infant formula may be a source of *Salmonella* in infants. *Id.* at 16–17 ¶¶ 52–54. The close temporal connection between J.M.'s death and his

consumption of the product at issue, in addition to the allegation that it was the only product he consumed during his tragically brief life, are sufficient to allege causation at the motion to dismiss stage. *Cf. Ferry*, 514 F. Supp. 3d at 444.

Abbott argues that Plaintiffs' allegation about J.M.'s exclusive consumption of NeoSure is insufficient to support causation because "food consumption is not the sole pathway to a *Salmonella* infection," and could have come from "the bottled water used to mix the formula" or a "household" or other environment.[5]   ECF 19, at 8–9.   Of course, "the element of 'causation' always implicates an analysis of intervening and superseding causes" in a products liability case. *Collins v. Li*, 933 A.2d 528, 574 (Md. App. 2007), *aff'd sub nom. Pittway Corp. v. Collins*, 973 A.2d 771 (Md. 2009).   But at the motion to dismiss stage, the Court must take all well-pled facts as true and the reasonable inferences flowing therefrom in the light most favorable to the Plaintiffs. *See Vitol, S.A.*, 708 F.3d at 539.   So while Plaintiffs "may have a difficult time proving that the Defendants' [ ] infant formulas caused" J.M.'s condition, the mere possibility of an intervening cause is not sufficient to dismiss the complaint or to conclude that Plaintiffs lack standing. *Ferry*, 514 F. Supp. 3d at 444; *cf. Pittway Corp.*, 973 A.2d at 792 (affirming intermediate appellate court's reversal of circuit court's dismissal of product liability claims where "acts alleged in the Complaint admit[ted] of more than one inference, making it improper to determine—on a motion to dismiss— whether intervening negligent acts or omissions were . . . superseding causes of respondents' injuries").

---

[5] Another potentially complicating factor regarding causation is Plaintiffs' allegation that J.M. consumed both "Similac Neosure ready-made product as well as Similac Neosure powdered infant formula."  ECF 1, at 35 ¶ 92.  However, for the reasons stated above, the Court does not view the exclusive consumption of two of *Abbott's* products to warrant dismissal on causation grounds.

The Court therefore concludes that Plaintiffs have plausibly alleged causation, both for the purposes of Article III and with respect to Plaintiffs' state law claims, including Plaintiffs' wrongful death claim (Count I) and strict liability manufacturing defect claim (Count VI).[6]

## B.    Choice of Law

The Court first turns to the question of what law should be employed to evaluate the viability of Plaintiffs' claims.  Plaintiffs allege diversity jurisdiction under 28 U.S.C. 1332(a).  ECF 1, at 5.  "A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules."  *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013) (first citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); and then citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)).  Plaintiffs allege a variety of state tort or tort-related claims, and Maryland courts generally adhere "to the *lex loci delicti* principle in tort cases."  *Lab'y Corp. of Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006); *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 230, 233 n.28 (Md. 2000); *see also Loh v. Safeway Stores, Inc.*, 422 A.2d 16, 22–23 (Md. App. 1980) (noting that breach of warranty claims have a close kinship to tort as well as contract and observing Maryland cases holding law of the place of the sale may govern the extent and effect of warranties).  In other words, for tort actions, Maryland courts generally apply "the substantive law of the place of the wrong," which, "[f]or a tort, . . . is the place where the final element of the cause of action occurs."  *Doctor's Weight Loss Ctrs., Inc. v. Blackston*, 319 A.3d 1102, 1104 (Md. 2024).  Where the elements of a tort make clear it "require[s] that the plaintiff

---

[6] Beyond the Article III and general causation arguments advanced, Abbott does not argue for the dismissal of Plaintiffs' wrongful death claim (Count I) and strict liability manufacturing defect claim (Count VI).  *See generally* ECF 11-1; ECF 19.  Accordingly, those claims survive Abbott's motion to dismiss.  Abbott "remain[s] free, of course, to raise any and all appropriate grounds and arguments [it] wish[es] at the summary judgment stage" regarding those claims, if the litigation advances to that stage.  *Rhee Bros. v. Han Ah Reum Corp.*, 178 F. Supp. 2d 525, 531 n.4 (D. Md. 2001).

have sustained injuries," that tort is generally not "'completed until the occurrence of an 'injury' that is attributable to the defendant's wrongful conduct.'" *Id.* at 1114 (citations omitted).

Plaintiffs agree with this general premise. *See* ECF 18, at 13. However, Plaintiffs argue in their opposition memorandum that Illinois substantive law should be applied to their wrongful death claim.[7] *Id.* The Court will briefly address the question of choice of law as it applies to Plaintiff's wrongful death claim in its analysis of that claim. However, with respect to Plaintiffs' other tort claims, the Court applies Maryland law because the relevant alleged injury—J.M.'s infection and passing—occurred in Maryland. *See* ECF 1, at 36 ¶¶ 100–05.

### C.    Wrongful Death (Count I)

Abbott does not specifically challenge the viability of Plaintiffs' wrongful death claim, other than raisings arguments to dismiss the suit entirely on causation and standing grounds. *See generally* ECF 11-1. However, should it survive, the parties dispute which law would apply to this claim. *See* ECF 18, at 13–14; ECF 19, at 7. "In a products liability claim where the manufacture or design defect is the averred cause of death, the 'wrongful act' takes place where the alleged defective design or manufacture of the device occurred." *Winkler v. Medtronic, Inc.*, Civ. No. PX-18-00865, 2018 WL 6271055, at *3 (D. Md. Nov. 29, 2018); *see also Kielar*, 647 F. Supp. 2d at 527–28 (applying Louisiana law to wrongful death products liability claim where death occurred in Maryland and plaintiffs had not introduced evidence that the allegedly defective product was designed or manufactured outside of Louisiana); *Desrosiers v. MAG Indus.*

---

[7] To the extent that Plaintiffs argue that Illinois substantive law should apply to *all* claims because of the distinct choice of law rules applicable to the wrongful death claim, Plaintiffs cite no precedent to support that approach, and the Court has identified only case law supporting a claim-by-claim approach to choice of law analysis under Maryland law. *See, e.g.*, *Wells v. Liddy*, 186 F.3d 505, 521–22 (4th Cir. 1999) (offering an example of how Maryland choice of law analysis depends on the type of claim alleged).

*Automation Sys., LLC*, Civ. No. WDQ-07-2253, 2010 WL 4116991, at *2 (D. Md. Oct. 19, 2010) (applying Wisconsin law to wrongful death defective design claim where death occurred in Maryland and allegedly defective product was manufactured in Wisconsin).

Wrongful death actions in Maryland are governed by statute.[8] *See* Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-901 et seq.; *Kielar v. Granite Const. Co.*, 647 F. Supp. 2d 524, 526 (D. Md. 2009). Section 3-902 of the Courts and Judicial Proceedings Article of the Maryland Code provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another." CJP § 3-901(a). The statute defines "wrongful act" to mean "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." *Id.* § 3-901(e). "If the wrongful act occurred in another state," Maryland courts are directed to "apply the substantive law of that jurisdiction." *Id.* § 3-903(a). In so doing, "the Maryland statute specifically identifies the locus of the 'wrongful act' rather than the locus of death as the critical choice of law determinant in wrongful death actions with multi-state connections" and "makes specific for wrongful death cases the 'place-of-wrong's-standard-of-care' exception to the classic *lex loci* rule." *Farwell v. Un*, 902 F.2d 282, 287 (4th Cir. 1990).

Plaintiffs' complaint contains considerable detail about Abbott's Sturgis, Michigan facility. *See, e.g.*, ECF 1, at 3 ¶ 4, at 8 ¶ 26, at 9 ¶ 29, at 13 ¶ 40. But, as Abbott observes, Plaintiffs do not allege where the precise NeoSure formula that J.M. consumed was manufactured. To the contrary, Plaintiffs' complaint suggests that multiple of Abbott's facilities may be responsible for

---

[8] "[T]he Maryland wrongful death statute provides a new and independent cause of action[.]" *Spangler v. McQuitty*, 141 A.3d 156, 165 (Md. 2016); *see also Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 176 (D. Md. 2023) ("In contrast to a wrongful death action, the survival statute creates no independent cause of action.").

manufacturing powered infant formulas such as NeoSure. *See* ECF 1, at 8 ¶ 27 ("Upon information and belief, this problem exists not just at the Sturgis facility, but at all of Abbott's facilities responsible for manufacturing and distributing powdered infant formulas."), at 33 ¶ 86 (discussing FDA investigation at Abbott's Casa Grande, Arizona facility).   For example, the October 2022 recall of "ready-feed NeoSure products" referenced in the complaint involved products manufactured at Abbott's Columbus, Ohio facility. *Id.* at 33 ¶ 87 & n.84.   Regardless, Plaintiff's complaint is devoid of any suggestion that product manufacturing occurs in Illinois, the location of Abbott's headquarters. *See id.* at 6 ¶ 17.

However, it is of no consequence here that Plaintiffs did not plead specific facts alleging which forum's law applies to its wrongful death claim.   "The court may appropriately undertake a choice of law analysis at the motion to dismiss stage where the factual record is sufficiently developed to facilitate the resolution of the issue." *Taylor v. Walter Kidde Portable Equip., Inc.*, No. 1:21CV839, 2022 WL 4450271, at *5 (M.D.N.C. Sept. 23, 2022) (quoting *In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prod. Liab. Litig.*, Civ. No. 3:11-CV-02784-JMC, 2013 WL 1316562, at *2 (D.S.C. Mar. 27, 2013)).   Often, however, a court "is 'in a better position to decide a choice of law issue after the parties have developed the factual evidence through the process of discovery.'" *Id.* (quoting *Clean Earth of Md., Inc. v. Total Safety, Inc.*, No. 2:10-CV-119, 2011 WL 1627995, at *4 (N.D.W. Va. Apr. 28, 2011)); *Canada Pipeline Accessories, Co. v. Canalta Controls, Ltd.*, Civ. No. 3:12-8448, 2013 WL 3233464, at *8 (S.D. W. Va. June 25, 2013) ("As courts in this circuit and others have recognized, a choice-of-law analysis at the motion-to-dismiss stage is often premature."); *McMillan v. Kansas City Life Ins. Co.*, No. 1:22-CV-01100-ELH, 2023 WL 2499746, at *14 (D. Md. Mar. 14, 2023) ("Indeed, jurists have noted that in complex cases, choice of law analyses can be difficult to conduct at the motion to dismiss stage

and may be better suited for discussion in the context of a motion for summary judgment." (collecting cases)). Given that additional factual development is needed to assess which law applies to the wrongful death claim, and noting that no argument for dismissal of this claim hinges on what law applies, the Court declines to determine what law applies to Plaintiffs' wrongful death claim at this early stage of the litigation.

### D.    Negligent Misrepresentation or Omission (Count II)

In Count II, Plaintiffs allege that "[t]hrough its labeling and advertising, Defendant made representations to Plaintiffs concerning the safety of their Similac, Alimentum, and EleCare Products" that were false, "and the representations regarding the quality and safety of the product amount to negligent misrepresentation" upon which "Plaintiffs reasonably relied. ECF 1, at 38 ¶ 119. In Maryland, a claim for negligent misrepresentation contains five elements: (1) "the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;" (2) "the defendant intends that his statement will be acted upon by the plaintiff;" (3) "the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;" (4) "the plaintiff, justifiably, takes action in reliance on the statement; and" (5) "the plaintiff suffers damage proximately caused by the defendant's negligence." *Kramer v. Ethicon, Inc.*, Civ. No. GLR-20-3747, 2021 WL 6135206, at *9 (D. Md. Dec. 28, 2021) (quoting *Rucker v. Branch Banking & Tr. Co.*, Civ. No. GJH-20-0881, 2021 WL 962516, at *9–10 (D. Md. Mar. 14, 2021)). "[A] claim of negligent misrepresentation under Maryland law does not contain an essential showing of fraud and thus the heightened pleading requirements of Rule 9(b) do not apply." *Balt. Cnty. v. Cigna Healthcare*, 238 F. App'x 914, 921 (4th Cir. 2007).

Count II also alleges a claim for negligent omission. *See* ECF 1, at 37. Although the Court is not aware of a decision from the Supreme Court of Maryland "specifically recogniz[ing] a claim for negligent omission of fact, the court has countenanced such a cause of action, stating that 'if a

party to a transaction is under a duty to speak, the failure to speak may, under appropriate circumstances in an action founded on negligent misrepresentation, constitute a representation.'" *Dunhem v. SunTrust Banks, Inc.*, Civ. No. AW-04-1016, 2006 WL 8457036, at *6 (D. Md. Mar. 23, 2006) (quoting *Leonard v. Sav-A-Stop Servs., Inc.*, 424 A.2d 336, 340 (Md. 1981)).   In other words, "[n]egligent omission occurs where a defendant represents only 'half of the relevant picture without disclosing the remaining facts.'" *Id.* (quoting *Lubore v. RPM Assoc., Inc.*, 674 A.2d 547, 561 (Md. App. 1996)).   "[A] fragmentary representation can be rendered misleading by virtue of material facts not disclosed." *Lubore*, 674 A.2d at 561.

With respect to both theories, Abbott takes issue with the fourth element, arguing that "Plaintiffs fail to plead any facts demonstrating reliance on an Abbott statement, a necessary element of a negligent misrepresentation claim."  ECF 11-1, at 21.   Specifically, Abbott asserts that Plaintiffs do not allege they ever read or reviewed Abbott's representations "prior to their feeding Abbott formula to J.M.," such as visiting Abbott's website, reviewing promotional materials, reading formula labels, or even viewing the statements referenced in the complaint.  *See id.*  Abbott contends that the only allegation related to reliance is the conclusory allegation that Plaintiffs "reasonably relied upon such representations and omissions to their detriment."  *Id.* (alterations omitted) (quoting ECF 1, at 38 ¶ 120).

In sum, "[n]egligent misrepresentation focuses on 'affirmative statements made by the defendant that were intended to, and indeed, had the effect of inducing the plaintiff to carry out some action in reliance on the false statements.'"  *McGinn v. Broadmead, Inc.*, 759 F. Supp. 3d 649, 670 (D. Md. 2024) (quoting *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 274 n.10 (Md. 2007)). Here, Plaintiffs allege various statements and representations throughout the complaint allegedly made by Abbott about Abbott products.  *See, e.g.*, ECF 1, at 1–2 ¶ 2.  However, Plaintiffs fail to

plead that they reviewed, read, or otherwise knew of—and relied on—any of Abbott's statements in deciding to feed J.M. the products at the heart of this case. Plaintiffs do assert that they "used the Defendant's product on the assumption that the labeling of Defendant's products was accurate and that the products were unadulterated, safe, and effective." ECF 1, at 6. But acting on an assumption about a label or product and actually relying on the precise information provided about that product are distinct courses of action.[9] In any event, Plaintiffs' complaint contains no specific reference to any allegedly false statement on the NeoSure label, instead references statements made by Abbott on a website, and never alleges that Plaintiffs reviewed these statements and relied on them in selecting or using the formula products at issue. *See, e.g.*, ECF 1, at 1–2 ¶ 2 (citing statements on Abbott's website), at 6 ¶ 16 (same), at 7–8 ¶¶ 22–23 (same); *cf. Kramer*, 2021 WL 6135206, at *9 (dismissing a negligent misrepresentation claim where plaintiff did "not allege that she relied on any specific statement").

Plaintiffs cite a North District of Illinois case for the proposition that any greater detail than general reliance at the motion to dismiss stage is unnecessary to survive a Rule 12(b)(6) motion. *See* ECF 18, at 21–22 (citing *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, No. 22-C-4148, 2023 WL 3585639 (N.D. Ill. May 22, 2023)). There, the court considered a fraud-based misrepresentation claim and cited a Seventh Circuit case applying Rule 9(b)'s pleading requirements to a common law fraud action for the proposition that a plaintiff need not demonstrate "reliance on the defendant's misrepresentations or omissions, and the reasonableness of that

---

[9] The Court observes that the opposite inference is readily available from the facts pled—Plaintiffs were provided Abbott's "ready-feed and powder Product by [ ] Johns Hopkins Hospital" and J.M. "exclusively consumed the Neosure products that were provided by Johns Hopkins Hospital." ECF 1, at 3 ¶ 6, at 35 ¶ 95. It is more likely that Plaintiffs relied on statements made by the hospital with respect to the product, rather than statements made by Abbott. However, the Court only draws reasonable factual inferences from the complaint that favor the Plaintiffs in ruling on the pending motion. *See Vitol, S.A.*, 708 F.3d at 539.

reliance" to satisfy Rule 9(b). *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 2023 WL 3585639, at *9 (quoting *Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993)). Here, however, the Court considers a negligent misrepresentation claim under of Maryland law and Maryland's "common law tort of negligent misrepresentation" to which Rule 9(b) does not apply, and which "incorporates reliance as an element of proof." *Philip Morris Inc.*, 752 A.2d at 235. Accordingly, because the complaint lacks non-conclusory allegations that Plaintiffs relied on Abbott's statements in deciding to feed J.M. an Abbot product, Plaintiffs' negligent misrepresentation and omission claim (Count II) will be dismissed.

### E.    Breach of Express and Implied Warranties (Counts III and IV)

In Count III, Plaintiffs allege a breach of express warranty under Maryland law. *See* ECF 1, at 38–39. "Breaches of express warranties are governed by Title Two of the Commercial Law Article of the Maryland Annotated Code." *Wood v. Blue Diamond Growers*, 722 F. Supp. 3d 554, 562–63 (D. Md. 2024) (citing Md. Code Ann., Com. Law ("CL") § 2-313). Section 2-313 of that Article provides that express warranties are created, in relevant part, by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain." CL § 2-313(1)(a)–(b).

In Count IV, Plaintiffs allege a breach of an implied warranty under Maryland law. Sections 2-314 and 2-315 of the Commercial Law Article govern implied warranties. *See* CL §§ 2-314, 2-315. In general, there are two types of implied warranties. *See id.* First, the implied warranty of merchantability creates "a warranty that the goods shall be merchantable" and "is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Id.* § 2-314(1); *see also id.* § 2-314(2) (providing requirements for "merchantable" goods). Second, the implied warranty of fitness for a particular purpose provides that where "the seller at

the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." *Id.* § 2-315(1).

Whether alleging breach of an express or implied warranty, if the good has been accepted, "[t]he buyer must within a reasonable time after he discovered any breach notify the seller of breach or be barred from any remedy." *Id.* § 2-607(3)(a); *see also id.* § 2-607(4) ("The burden is on the buyer to establish any breach with respect to the goods accepted."); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011) ("Furthermore, a notification to a seller within a reasonable time is a 'prerequisite' for claiming a breach of implied warranty." (quoting *Lynx, Inc. v. Ordnance Prods.*, 327 A.2d 502, 513 (Md. 1974)). The Supreme Court of Maryland has interpreted § 2-607's notice provision "to require the buyer to inform the seller of the breach, the particular goods that have been impaired, and set forth the nature of the nonconformity." *Doll*, 814 F. Supp. 2d at 542 (quoting *Lynx, Inc.*, 327 A.2d at 513).

1.   Notice

Abbott first argues that Plaintiffs have failed "to satisfy the pre-suit notice requirement," and points out that Plaintiffs both fail to allege that they informed Abbott there was a breach and fail to cite "the particular component that was impaired and the nature of the nonconformity." ECF 11-1, at 26–27 (quoting *Doll*, 814 F. Supp. 2d at 542). The Court agrees with Abbott that the complaint does not plead, and Plaintiffs do not assert, that any pre-suit notice was provided to Abbott. Neither can Plaintiffs' complaint itself provide sufficient notice under § 2-607(3). *See Wood*, 722 F. Supp. 3d at 563 ("[T]he Supreme Court of Maryland has held that 'the institution of an action . . . cannot by itself be regarded as a notice of the breach under . . . 2-607(3).'" (citation omitted) (collecting cases)). Nevertheless, the Court finds that Plaintiffs were not required to

27

provide pre-suit notice as they are not considered buyers under the statute. *See* CL § 2-103(1)(a) ("'Buyer' means a person who buys or contracts to buy goods.").

Section 2-318 of the Commercial Law Article provides that "[a] seller's warranty whether express or implied extends to . . . any other ultimate consumer or user of the goods or person affected thereby if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." CL § 2-318. Moreover, "[a] seller may not exclude or limit the operation" of the section. *Id.*; *see also Loh*, 422 A.2d at 22 n.12 ("[T]he strict rules of privity have been relaxed by Section 2-318 of the Commercial Law Article[.]"). Plaintiffs do not plead that they purchased any of Abbott's products, but rather aver that they fed J.M. "the Neosure products that were provided [to them] by Johns Hopkins Hospital." ECF 1, at 35 ¶ 95.

Plaintiffs contend that "Maryland courts have held that notice requirements may not apply in personal injury cases" involving third-party beneficiaries "because the purpose of the requirement—to enable the seller to correct the defect and minimize damages—cannot be fulfilled after the injury has occurred." ECF 18, at 26 (first citing *Mattos, Inc. v. Hash*, 368 A.2d 993, 996 (Md. 1977); and then citing *Frericks v. General Motors Corp.*, 363 A.2d 460, 465 (Md. 1976)). In the 1970s-era cases that Plaintiffs cite, Maryland's highest court considered whether a third-party beneficiary, as a non-purchaser of a good, was required under § 2-607 to give notice of a breach of warranty to the seller of a good. *See Mattos, Inc.*, 368 A.2d at 996; *Frericks*, 363 A.2d at 465. In *Frericks*, the Supreme Court of Maryland recognized that one purpose of the notice requirement is to inform the seller of a defect in the product, thus enabling him to correct the defect, if possible, and to minimize any damages. *Frericks*, 363 A.2d at 465. The court also rejected the argument that a purpose of the notice requirement was to protect the seller from stale

claims or to enable the seller to marshal evidence for a defense, noting that the statute of limitations served those purposes.  *See id.*

The Supreme Court of Maryland in *Mattos, Inc.* likewise considered whether an appellee who dealt more directly with the salesman in purchasing the allegedly defective good was subject to the notice requirement of § 2-607.  *Mattos, Inc.*, 368 A.2d at 996–97.  The court held that the "[a]ppellee was no more the buyer of the clamps, and no less a third party beneficiary, than would have been any other ultimate consumer who, within the contemplation of [§] 2-318, used a defective product purchased by another person."  *Id.* at 997.  Accordingly, "appellee's breach of warranty claim was not barred by his failure to notify the seller of the breach prior to filing suit." *Id.*; *cf. Firestone Tire & Rubber Co. v. Cannon*, 452 A.2d 192, 192, 198 (Md. App. 1982) (holding that a buyer need not give notice of a claimed breach of implied warrant to a "remote" seller, or someone in the marketing chain other than the person from whom he bought the goods, under § 2-706(3)(a)), *aff'd,* 456 A.2d 930 (Md. 1983) (per curiam) (adopting the intermediate appellate court's opinion).

Although the Court has not located more modern case law in Maryland addressing the applicability of the notice provision in § 2-607(3)(a) to third-party beneficiaries or "any other ultimate consumer," *Mattos, Inc.*, 368 A.2d at 997, it agrees with Plaintiffs that the logic of these cases apply with equal force to the provisions of the Maryland Uniform Commercial Code applicable to warranties at issue in this case.  As the Maryland Supreme Court explained in *Mattos*, the Maryland General Assembly's "definition of 'buyer' as a 'person who buys or contracts to buy goods' is no less significant here than it was in *Frericks*." *Id.*  "[I]t is 'an actual buyer . . . who is required by [§] 2-607 to give notice," and Plaintiffs were "no more buyer[s]" of the NeoSure "than would have been any other ultimate consumer who, within the contemplation of [§] 2-318, used a

defective product purchased by another person." *See id.* Consequently, the Court concludes that Plaintiffs did not need to provide pre-suit notice to Abbott under § 2-607(3)(a) and the breach of warranty claims won't be dismissed for failure to provide such notice.

### 2. Breach of Express Warranty (Count III)

"To prevail on a claim for breach of express warranty under Maryland law, 'a plaintiff is required to establish that 1) a warranty existed; 2) the product did not conform to the warranty, and 3) the breach proximately caused the injury or damage.'" *Palmer v. CVS Health*, Civ. No. CCB-17-938, 2019 WL 6529163, at *6 (D. Md. Dec. 4, 2019) (quoting *SpinCycle, Inc. v. Kalender*, 186 F. Supp. 2d 585, 589 (D. Md. 2002)). Moreover, because Plaintiffs were not buyers of the NeoSure formula nor were they in receipt of any sample or model, an express warranty under Maryland law may have been created primarily by "[a]ny description of the goods which [was] made a part of the basis of the bargain." CL § 2-313(1)(b).

"A plaintiff must set forth the 'terms and conditions of a warranty.'" *Harden v. Budget Rent A Car Sys., Inc.*, 726 F. Supp. 3d 415, 433 (D. Md. 2024) (quoting *Moczulski v. Ferring Pharms., Inc.*, Civ. No. JKB-18-1094, 2018 WL 3496433, at *5 (D. Md. July 20, 2018)). Without the inclusion of the terms and conditions, "no conclusion can be drawn that such a cause of action exists." *Thomas v. Ford Motor Credit Co.*, 429 A.2d 277, 283 (Md. App. 1981). "The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract." *Rite Aid Corp. v. Levy-Gray*, 894 A.2d 563, 572 (Md. 2006) (quoting CL § 2-313, official comment 7). "[N]o particular reliance on such statements need be shown in order to weave them into the fabric of the agreement." *Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 108 (D. Md. 2020) (citing CL § 2-313, official comment 3). And "[i]t is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have

a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  CL § 2-313(2).  "[W]hether the seller creates an express warranty is typically a question of fact[.]"  *Morris*, 491 F. Supp. 3d at 108 (citing CL § 2-313, official comment 3).

Abbott argues that Plaintiffs have failed to identify any actionable warranty statements as to Abbott's NeoSure products.  *See* ECF 11, at 28; ECF 18, at 16.  Plaintiffs contend that "the affirmative statements about the safety and efficacy of Abbott's formula" on its "written literature, packaging, labeling, and written and media advertisement" are "assertions of fact that created an express warranty."  ECF 18, at 27–28.  Abbott responds that generic statements, not specific to NeoSure, are not sufficient to set out terms and conditions on which to base a breach of express warranty claim.  *See* ECF 19, at 16–17.  Moreover, Abbott argues that even if it "had made a statement to the effect that its NeoSure formula was 'safe' or 'fit,' case law is clear that such statements are too indefinite to be actionable."  *Id.* at 17.

The Court agrees that Plaintiffs failed to "set forth the 'terms and conditions of a warranty'" related to NeoSure in their complaint.  *Harden*, 726 F. Supp. 3d at 433.  In asserting the breach of express warranty claim, Plaintiffs only identify a statement Abbott allegedly made "that the 'infant formula' [is] a formula that 'starts reducing excessive crying and colic symptoms in most babies within 24 hours, so your baby can start feeling better today.'"  ECF 1, at 39 ¶ 125.  First, Plaintiffs fail to allege when and in what context Abbott provided that statement, and similarly fail to allege what infant formula the statement related to.  *See id.*  Second, this suit does not allege that the "product did not conform to the warranty" with respect to crying and colic symptoms.  *See Palmer*, 2019 WL 6529163, at *6.  The complaint includes other statements, such as Abbott's reference to itself as "a leader in nutrition science," with the "goal" to "deliver nutrition products" that will

"better life for people of all ages."  ECF 1, at 7 ¶ 22.  However, those statements are "an affirmation merely of the value of the goods" Abbott produces, and not specific to NeoSure, and so they cannot be fairly "regarded as part of [any] contract" that existed here.  *Rite Aid Corp.*, 894 A.2d at 572; *see also* ECF 1, at 7–8 ¶ 23 (referring to Abbott's statement that it makes "products to help babies and children grow" and "provide[s] resources to help people live their best life").  Accordingly, the Court will dismiss Plaintiffs' breach of express warranty claim (Count III).[10]

### 3.    Breach of Implied Warranty (Count IV)

"To assert a claim for breach of implied warranty of merchantability, 'a plaintiff must establish that a product is not of merchantable quality and that he suffered an injury as a result. A product is not of merchantable quality when it is not fit for the ordinary purposes for which it is used.'"  *Montgomery v. CSX Transp., Inc.*, Civ. No. SAG-14-1520, 2015 WL 770470, at *4 (D. Md. Feb. 20, 2015) (quoting *Pinney v. Nokia, Inc.*, 402 F.3d 430, 444 (4th Cir. 2005)).  "To recover on a claim for breach of implied warranty of merchantability, as with a strict liability or negligence claim, a plaintiff must prove the existence of a defect at the time the product leaves the manufacturer."  *Id.* (quoting *Grinage*, 840 F. Supp. 2d at 871).

Aside from its notice argument, Abbott advances only one argument in support of dismissing Plaintiffs' implied warranty of merchantability claim: that implied warranties are not applicable to gifts, so the fact that Plaintiffs did not purchase the NeoSure formula from Johns

---

[10] Abbott has attached to their opposition memorandum a typical Similac NeoSure product label. *See* ECF 11-3, at 2.  Plaintiffs reference Abbott's "labeling" as part of their breach of express warranty claim.  ECF 1, at 38 ¶ 124.  Nevertheless, Plaintiffs' complaint fails to allege how "the product did not conform to the warranty" by identifying the "affirmative statement of fact" Plaintiffs take issue with on any "labeling."  *See Morris*, 491 F. Supp. 3d at 107–08.  And to the extent that Plaintiffs seek to challenge Abbott's "alleged omissions" in labeling, rather than specific "affirmative representations" of fact, an express warranty claim cannot support that challenge as "'[w]arranty by omission' . . . would be at odds with the Maryland definition of an express warranty."  *See id.* at 108 (citation omitted).

Hopkins Hospital should preclude Plaintiffs from asserting this claim. ECF 11-1, at 27–28 (citing *Sheeskin v. Giant Food, Inc.*, 318 A.2d 874, 881 n.3 (Md. Ct. Spec. App. 1974), *aff'd sub nom. Giant Food, Inc. v. Washington Coca-Cola Bottling Co.*, 332 A.2d 1 (Md. 1975)). But Abbott's argument must be squared with the plain language of § 2-318 which provides that certain *non-buyers*, such as "any natural person who is in the family or household of [the] buyer or who is a guest in his home or any other ultimate consumer or user of the goods or person affected thereby" are nonetheless covered by an express or implied warranty despite not being the actual purchaser of the item at issue. CL § 2-318. It is true that Maryland's intermediate appellate court has observed that "[i]mplied warranties are not applicable to gifts because these transactions, while they may involve the passing of title to movable things, do not require that a price be paid." *Sheeskin*, 318 A.2d at 881 n.3. However, the context of the opinion makes clear that in so saying, the court was referring to the necessity of some underlying sale or contract for sale "to some individual in the distributive chain in order for the implied warranties to arise in favor of the ultimate consumer," even though "privity between the bottler and the ultimate consumer is not required." *Id.* at 886. Here, the complaint alleges facts giving rise to a reasonable inference that at one point in the distributive chain, before the NeoSure formula reached Plaintiffs, there was a "sale or contract for sale" with respect to the product.[11] *See id.*; ECF 1, at 3 ¶ 6. Accordingly, the Court will not dismiss Plaintiffs' breach of implied warranty of merchantability claim.

However, to the extent that Count IV alleges that Abbott breached an implied warranty for fitness for a particular purpose, *see* ECF 1, at 40 ¶ 139, any such claim fails. "Unlike a claim for

---

[11] *Cf. Sec. Nat. Bank of Sioux City, Iowa v. Abbott Lab'ys*, 947 F. Supp. 2d 979, 996 (N.D. Iowa 2013) (holding that Abbott was entitled to summary judgment on remaining breach of warranty claims where it had shown that there was never any sale of formula "because the formula was given to the hospital as a gift, not for any consideration").

breach of implied warranty of merchantability, a claim for breach of implied warranty of fitness for a particular purpose does not require proof of a defect." *Montgomery*, 2015 WL 770470, at *5 (citing *Grinage v. Mylan Pharms., Inc.*, 840 F. Supp. 2d 862, 871 (D. Md. 2011)). Such a claim "does, however, require that 'the buyer have a particular purpose and that the seller have reason to know of that particular purpose.'" *Id.* (internal quotation marks omitted) (quoting the same). The "particular purpose must be distinguishable from the normal use of the goods" and "peculiar to the buyer." *Ford Motor Co. v. Gen. Acc. Ins. Co.*, 779 A.2d 362, 375 (Md. 2001) (internal quotation marks and citations omitted).

Plaintiffs have not alleged any particular purpose communicated to Abbott that was unique to Plaintiffs. To the contrary, Plaintiffs' complaint alleges facts showing that the NeoSure products were used precisely for their ordinary purpose—to feed an infant child. *See* ECF 1, at 1–2 ¶ 2, at 35 ¶¶ 91–98. Plaintiffs' own allegations thus refute the existence of a warranty of fitness claim under Maryland law. *Cf. Montgomery*, 2015 WL 770470, at *5 (holding that where plaintiffs provided no indication they had a particular purpose for a product "that differed from that of any other purchaser" and complaint stated product was purchased "for the particular purpose for which it was designed," warranty of fitness claim must be dismissed); *see also Bond v. Nibco, Inc.*, 623 A.2d 731, 736 (Md. App. 1993) (holding that plaintiff failed to state a claim where he "nowhere alleged that he bought the faucets for a 'particular purpose' that in any way differed from the 'ordinary purpose' for which these faucets might be used, let alone that [the defendant], which manufactured but did not sell these faucets to him, knew of this 'particular purpose'").

## F.    Failure to Warn (Count V)

Count V alleges a "strict product liability – failure to warn" claim. ECF 1, at 41 (capitalization altered). Plaintiffs allege that "Defendant knew or should have known that the Defendant's Similac, Alimentum, and EleCare Products contained *Cronobacter sakazakii* and

*Salmonella*," had a "duty to warn Plaintiffs about the presence of microorganisms," and ultimately did not warn Plaintiffs of that risk. *Id.* ¶¶ 143–47. As an initial matter, "[u]nder Maryland law, 'negligence concepts and those of strict liability have morphed together' in failure to warn cases."[12] *Morris*, 491 F. Supp. 3d at 104 (quoting *Gourdine v. Crews*, 955 A.2d 769, 782 (Md. 2008)). "Thus, the traditional concepts of duty, breach, causation, and damage are required for both causes of action." *Id.* (citing *Mazda Motor of Am., Inc. v. Rogowski*, 659 A.2d 391, 394 (Md. App. 1995)). "Maryland courts recognize a presumption with regard to causation, that plaintiffs "would have heeded a legally adequate warning had one been given." *Grinage*, 840 F. Supp. 2d at 868 (quoting *U.S. Gypsum Co. v. Mayor & City Council of Balt.*, 647 A.2d 405, 413 (Md. 1994)).

"A seller has a duty to warn of the dangers of a product 'if the item produced has an inherent and hidden danger that the producer knows or should know could be a substantial factor in causing an injury.'" *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420 (D. Md. 2019) (internal quotation marks omitted) (quoting *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 413 (D. Md. 2001)); *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 641 (Md. 1992) (holding that a "seller is not strictly liable for failure to warn unless the seller has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the . . . danger" (internal quotation marks and citation omitted)). "Conversely, a seller does not have a duty to warn of an open and obvious danger in its product." *Id.* (citing *Mazda Motor of Am., Inc. v. Rogowski*, 659 A.2d 391, 395 (Md. App. 1995)). "Whether there is a duty to warn and the adequacy of warnings given must be evaluated in connection with the knowledge and expertise

---

[12] "[F]ailure to warn is not an independent theory of liability" and must be brought "brought under strict liability" or "under the rubric of negligence." *Morgan v. Graco Children's Prods., Inc.*, 184 F. Supp. 2d 464, 466 (D. Md. 2002) (citing *Mazda Motor of America, Inc. v. Rogowski*, 659 A.2d 391, 393–95 (Md. App. 1995)).

of those who may reasonably be expected to use or otherwise come into contact with the product[.]" *Id.* (internal quotation marks omitted) (quoting *Emory v. McDonnell Douglas Corp.*, 148 F.3d 347, 350 (4th Cir. 1998)). The duty to warn extends to both individuals supplied to and "to third persons whom the supplier should expect to be endangered by its use." *Id.* (quoting *Georgia Pac., LLC v. Farrar*, 69 A.3d 1028, 1033 (Md. 2013)); *see also May v. Air & Liquid Sys. Corp.*, 129 A.3d 984, 997 (Md. 2015) (discussing the evolution of the strict liability failure to warn cause of action in Maryland jurisprudence).

However, "[i]f the warnings or instructions on a product are adequate, 'the product is not defective, and the plaintiff cannot recover under a theory of strict liability in tort.'" *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 763 (D. Md. 2012) (quoting *Ellsworth v. Sherne Lingerie, Inc.*, 495 A.2d 348, 356 n.12 (Md. 1985)). "A warning is adequate if it 'explains the risk which allegedly caused the plaintiff's injury.'" *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 763 (D. Md. 2012) (quoting *Ames v. Apothecon, Inc.*, 431 F. Supp. 2d 566, 572 (D. Md. 2006)). "But if a warning is 'vague or otherwise difficult to understand' it 'shall not generally have the effect of barring a product liability claim when those warnings go unheeded.'" *Stanley*, 891 F. Supp. 2d at 763 (quoting *Lightolier, A Division of Genlyte Thomas Grp. LLC v. Hoon*, 876 A.2d 100, 111 (Md. 2005)). "The duty is to give a 'reasonable warning, not the best possible one." *Id.* (quoting *Nolan v. Dillon*, 276 A.2d 36, 40 (Md. 1971)). "[A] manufacturer 'need not warn of every mishap or source of injury that the mind can imagine flowing from the product.'" *Id.* (quoting *Liesener v. Weslo, Inc.*, 775 F.Supp. 857, 861 (D. Md. 1991).

Plaintiffs do not allege in their complaint that the NeoSure products contained a warning label, nor do they specify whether the strict liability failure to warn claim is specific to the powdered or ready-feed product, or both. *See* ECF 1, at 41–42 ¶¶ 142–50. However, Defendants

do not cite to any Maryland authority for the proposition that Plaintiffs had an obligation to do so in order for their failure to warn claim to survive a motion to dismiss. *Cf. Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 764 (D. Md. 2012) (holding at the motion to dismiss stage that warning was adequate where complaint alleged the warning on the product); *Patterson v. 3M Co.*, No. 1:21CV937, 2022 WL 17832161, at *4 (M.D.N.C. Sept. 8, 2022) (applying North Carolina law to hold that the fact plaintiff "did not identify the product" defendant alleged to have manufactured, produced or designed was not fatal to failure to warn claim where plaintiff was "regularly exposed" in defendant's "products and/or the products with which its products were designed to be used"). Accordingly, the Court will not dismiss the claim on that basis.

Abbott further argues for dismissal based on the NeoSure label attached to its opposition, which states that "[p]owdered infant formulas are not sterile." ECF 11-1, at 32; ECF 19, at 18. At the heart of a failure to warn claim brought on a theory of strict liability "is whether the lack of a proper warning made the product unreasonably dangerous." *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 764 (D. Md. 2012). "To be reasonable, a warning need not notify the user of the physical cause or the physiological nature of the injury he risks from the product." *Liesener v. Weslo, Inc.*, 775 F. Supp. 857, 861 (D. Md. 1991) (citing *Levin v. Walter Kidde & Co.*, 251 Md. 560, 248 A.2d 151 (1968)). Typically, a "general warning of danger suffices." *Id.* But "[u]sually inquiries into the reasonableness of conduct are the province of the [factfinder] rather than of the court." *Eagle-Picher Indus., Inc. v. Balbos*, 604 A.2d 445, 464 (Md. 1992). And at this stage, where the complaint does not specify the language of the label(s) at issue and Plaintiffs dispute the Court's consideration of the label attached to Abbott's opposition, *see* ECF 18, at 33 ("Even if the label cited by Abbott is properly before the court (it is not) . . . ."), the Court concludes that it is premature to dismiss the failure to warn claim on the basis of the attached label. Plaintiffs have

plausibly alleged a failure to warn claim at the pleading stage.  Abbott may renew its arguments at a later stage of litigation.

### G.    Damages Claims (Counts VII and VIII)

In Count VII, Plaintiffs attempt to assert "a derivative claim for damages" on behalf of Hunter seeking "reimbursement for medical expenses and other expenses incurred because of Plaintiff J.M.'s injuries."  ECF 43–44, at ¶¶ 160–61.  Abbott argues that this claim should be dismissed because there is no free-standing cause of action for "damages"—rather, "Abbott would only owe damages if it were liable under the substantive theories Plaintiffs articulate."  ECF 11-1, at 33.  Plaintiffs respond by attempting to recharacterize their claim, which is titled "claim for damages," ECF 1, at 43, as a separate cause of action by parents for the "medical expenses and loss of services" of their minor child, or a "survival claim," ECF 18, at 34.

To the extent Count VII asserts a claim for damages, the Court agrees with Abbott that it should be dismissed.  Count VII is styled as an independent cause of action "for damages."  ECF 1, at 43 (capitalization altered).  "[T]he question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive.'"  *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 69 (1992) (quoting *Davis v. Passman*, 442 U.S. 228, 239 (1979)); *see also Brunson v. Stein*, 116 F.4th 301, 306 (4th Cir. 2024) (explaining the meaning of a "cause of action").  Following that principle, there is no standalone cause of action for "damages."  *See Durm v. Am. Honda Fin. Corp.*, Civ. No. WDQ-13-0223, 2013 WL 6490309, at *7 (D. Md. Dec. 9, 2013) ("Similarly, consequential damages cannot be alleged as a standalone cause of action."); S*harma v. OneWest Bank, FSB*, Civ. No. DKC-11-0834, 2011 WL 5167762, at *7 (D. Md. Oct. 28, 2011) ("To the extent the count asserts only consequential damages rather than any legally cognizable cause of action, Plaintiffs fail to state a claim."); *Agwumezie v. Allstate Ins. Co.*, Civ. No. DKC-2002-0493, 2002 WL 32361936, at *3 (D. Md.

Aug. 8, 2002) ("While Plaintiff contends that any defects in Count V are merely technical, the count asserts only damages rather than any legally cognizable cause of action."), *aff'd,* 73 F. App'x 627 (4th Cir. 2003).

Plaintiffs alternatively contend that Count VII should be read as a "survival claim" which Hunter brings in her capacity as personal representative of J.M.'s estate. ECF 18, at 34; ECF 1, at 4 ¶ 7. "[I]n Maryland, a party can assert both a survival claim and a wrongful death claim when a person dies as a result of another's tortious conduct, as these are two separate and distinct causes of action." *Jones v. Prince George's Cnty.*, 541 F. Supp. 2d 761, 764 (D. Md. 2008), *aff'd,* 355 F. App'x 724 (4th Cir. 2009). "In what has been referred to as a 'survival' action, the personal representative of the victim may sue to recover, for the estate of the victim, damages for the economic and non-economic losses suffered by the victim prior to his or her death—the damages that the victim would have been able to recover had he or she survived." *Smith v. Borello*, 804 A.2d 1151, 1154 (Md. 2002). However, "a 'survival action' is merely the *mechanism* by which an estate brings a claim that the decedent could have asserted had he survived. It is not a 'claim' in the sense that, for example, one might assert a battery or negligence claim." *Mang v. City of Greenbelt*, Civ. No. DKC-11-1891, 2012 WL 115454, at *8 (D. Md. Jan. 13, 2012); *Jordan v. Mayor & City Council of Baltimore*, Civ. No. SAG-23-03413, 2024 WL 2956094, at *1 n.1 (D. Md. June 12, 2024) ("[T]here is no separate cause of action known as a 'survival claim.'" (citation omitted)). Because Count VII "fails to describe a separate tort or other claim that [J.M.] could have brought had he survived" and "attempts to state a claim for a 'survival action' as an independent cause of action," it must be dismissed. *See id.*

Similarly, Plaintiffs' claim for "punitive damages" in Count VIII of the complaint must be dismissed. As Plaintiffs acknowledge in their opposition memorandum, ECF 18, at 35, "a claim

for punitive damages is not a standalone cause of action. It is part of a prayer for relief." *Impac Mortg. Holdings, Inc. v. Timm*, 226 A.3d 323, 348 (Md. App. 2020), *aff'd,* 255 A.3d 89 (Md. 2021); *Zos v. Wells Fargo Bank, N.A.*, Civ. No. GJH-16-00466, 2017 WL 221787, at *6 (D. Md. Jan. 18, 2017) ("As federal and Maryland law do not allow a separate cause of action for punitive damages, such a request must be pled as an underlying part of another claim."); *see also Georgakopoulos v. Georgakopoulos*, No. 1149, Sept. Term, 2021, 2022 WL 4546676, at *7 (Md. App. Sept. 29, 2022).  The Court will thus dismiss Counts VII and VIII of the complaint.[13]

Finally, Abbott argues that the Court should not consider Plaintiffs' request for punitive damages as to the surviving claims.  In Maryland, punitive damages "may be awarded only where the plaintiff 'has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, i.e., actual malice." *Luminace Solar Maryland, LLC v. Tigo Enery, Inc.*, Civ. No. GLR-23-1606, 2024 WL 1283329, at *6 (D. Md. Mar. 26, 2024) (quoting Morris, 491 F. Supp. 3d at 108).  "To prove actual malice in a products liability case specifically, 'the plaintiff must prove (1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect,'" regardless of whether the cause of action is based on negligence or strict liability.  *Id.* (quoting the same); *see also Harris v. Dow Chem. Co.*, Civ. No. DKC-20-0988, 2020 WL 6874326, at *3 (D. Md. Nov. 23, 2020) ("In Maryland, a plaintiff seeking punitive damages for any tort must 'allege, in detail, facts that, if proven true, would support the conclusion that the act complained of was done with actual malice.'" (citation omitted)).

---

[13] Plaintiffs also include a request for "punitive damages" in their prayer for relief.  ECF 1, at 46. Dismissal of Count VII on the basis that a claim for "punitive damages" does not constitute a standalone action does not preclude Plaintiffs from seeking punitive damages as a form of relief for other causes of actions if appropriate under Maryland law.

Plaintiffs assert that Abbott's alleged conduct here, against the backdrop of bacterial contamination and product recall over the past decade or so, "represents a repeated, conscious disregard for the safety and lives of among the most vulnerable individuals—infants—that rises to the level of recklessness, wantonness, and malice." ECF 1, at 23 ¶ 71. Plaintiffs do not allege that the NeoSure products J.M. consumed were subject to the 2010 or 2022 recalls. Nor do Plaintiffs assert that the history of *Cronobacter* contamination they claim affected Abbott's products affected the NeoSure product that J.M. consumed. However, the accounting of past events involving contamination and recalls offered in the complaint provides more than a mere conclusory allegation of actual malice. *Cf. Luminace Solar Maryland, LLC*, 2024 WL 1283329, at *7 (holding that a plaintiff's complaint contained "sufficient facts to plead negligence or negligent failure to warn committed with actual malice" where plaintiffs noted a history of three complaints by other operators of solar installations similarly alleging that the defendant's installations were defective). Accordingly, the Court concludes that Plaintiffs have satisfied their burden at this early stage to request punitive damages.

## IV.    **CONCLUSION**

For the foregoing reasons, Abbott's motion to dismiss is granted in part and denied in part. Plaintiffs' wrongful death claim (Count I), implied warranty of merchantability claim (Count IV), strict liability failure to warn claim (Count V), and strict liability manufacturing defect claim (Count VI) continue, and all other claims are dismissed.

A separate implementing order will issue.

Dated: <u>February 20, 2026</u>                    _____/s/_____
                                                  Brendan A. Hurson
                                                  United States District Judge